United States District Court
Southern District of Texas

**ENTERED**

August 21, 2019

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TERRENCE NEIDIG, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-839 |
| | § | |
| ANDREW SAUL,[1] | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 18) and Defendant's Cross-Motion for Summary Judgment (Doc. 19). The court has considered the motions, Defendant's response, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under

---

[1] Nancy Berryhill was the Acting Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Andrew Saul is now Commissioner of the SSA and, as such, is automatically substituted as the defendant in this case. <u>See</u> 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. <u>See</u> Doc. 15, Ord. Dated Aug. 6, 2018.

Title II of the Social Security Act ("the Act").

## A. Vocational and Medical History

Plaintiff was born on March 2, 1980, and was thirty-five on the alleged disability onset date of September 1, 2015.[3]  Plaintiff graduated from high school.[4]  In 2002, Plaintiff was serving in the U.S. Navy as a boatswain mate (a ship driver).[5]  In 2003, Plaintiff had a position as a retail stocker, followed in 2004 by a job as an alarm installer.[6]  During 2005-2008, Plaintiff worked as a security officer and a 9-1-1 dispatcher at a university.[7]  After that, Plaintiff returned to the military as a U.S. Army truck driver.[8]  Plaintiff also worked as a delivery driver for a few months in 2014-2015 and as a retail stocker for a few months in 2015.[9]

While in the military, in April 2011, Plaintiff was exposed to a roadside bomb and lost consciousness for approximately one minute.[10]  He was diagnosed with traumatic brain injury ("TBI") and was released to full duty when his headaches diminished a few days

---

[3]      See Doc. 14, Tr. of the Admin. Proceedings ("Tr.") 36, 180.

[4]      See Tr. 36, 218.

[5]      See Tr. 36-37, 218.

[6]      See Tr. 37-38.

[7]      See Tr. 38-39.

[8]      See Tr. 39-40, 218.

[9]      See Tr. 218.

[10]      See Tr. 945, 948, 1031-32, 1034.

2

later.[11]   He continued to experience migraine headaches once per week for more than two years after the injury.[12]   In May to August 2013, Plaintiff was treated for headaches multiple times at a TBI neuropsychology clinic where he was prescribed medication.[13]   During that time, he left work a few hours early about ten times a month due to headaches.[14]   A TBI evaluation in July 2015 resulted in the medical impression that Plaintiff may have experienced a mild concussion in 2011 but that it was likely resolved and that his continuing issues of nightmares, irritability, anger, sleep disturbance, and post-deployment autonomic hyper-arousal possibly were related to the 2011 concussion but also likely related to Plaintiff's psychiatric conditions.[15]

Symptoms of posttraumatic stress disorder ("PTSD") began after the 2011 bombing incident but became more severe in 2013 as Plaintiff was preparing for another deployment.[16]   Plaintiff admitted himself to a hospital in March 2013 for "significant ongoing suicidal ideation" and, thereafter, never returned to full

---

[11]   See Tr. 948, 1031-32, 1034.

[12]   See Tr. 945, 948.

[13]   See Tr. 949.

[14]   See Tr. 948.

[15]   See Tr. 1036.

[16]   See Tr. 1285.

3

active duty.[17]  Plaintiff received a medical discharge in 2014.[18] After discharge, the U.S. Department of Veterans Affairs ("VA") found Plaintiff 100 percent disabled under its standards.[19]

In the months leading up to the alleged onset date, Plaintiff received treatment at the VA for headaches and back pain and psychotherapy and medication management for PTSD, and depression.[20]

### 1.   Headaches and Back Pain

Plaintiff's physicians continued prescribing Plaintiff medications to prevent and to abort headaches.[21] At an appointment in May 2016, Plaintiff reported that the medication "usually" successfully aborted the onset of a headache.[22]

The first recorded contact for back pain after the alleged onset date was on May 31, 2016, when Plaintiff was seen for a new-patient evaluation by a nurse who noted that, among other complaints, Plaintiff experienced chronic back pain.[23] Plaintiff was able to stand and ambulate independently and attended the appointment unaccompanied.[24] Plaintiff reported experiencing no

---

[17]    Tr. 301, 1285.

[18]    See Tr. 1285

[19]    See id.

[20]    See, e.g., Tr. 933-1089, 1210-46.

[21]    See, e.g., Tr. 949, 1179, 1297.

[22]    Tr. 1179.

[23]    See Tr. 1183.

[24]    See id.

pain.[25]

A staff physician also saw Plaintiff.[26]  Plaintiff reported experiencing chronic back pain with recently occurring pain in the tailbone when sitting or standing for long periods.[27]  Sheneka Mortley, M.D., ("Dr. Mortley") offered Plaintiff physical therapy, but he declined, explaining that physical therapy and a transcutaneous electrical nerve stimulation ("TENS") unit had not helped in the past.[28]  Instead, Dr. Mortley provided Plaintiff with a list of spine exercises and also suggested taking over-the-counter ibuprofen or Aleve to alleviate the back pain.[29]  A week later, Plaintiff failed to attend another appointment at the same facility.[30]

During a nursing initial evaluation prior to an appointment with Dr. Mortley on July 5, 2016, Plaintiff reported no pain.[31]  Dr. Mortley saw Plaintiff on followup for a foot wart and toenail fungus.[32]  Plaintiff reported no issues with headaches or back

---

[25]     See Tr. 1183-84.

[26]     See Tr. 1178-83.

[27]     See Tr. 1179.

[28]     See Tr. 1181.

[29]     See id.

[30]     See Tr. 1177.

[31]     See id.

[32]     See Tr. 1173-1176.

pain.[33]

On August 26, 2016, Plaintiff attended another appointment with Dr. Mortley and complained of worsening back pain over the prior three months.[34]  On initial evaluation, the nurse noted that Plaintiff was wearing a back brace but was able to ambulate and stand independently.[35]  She also documented that Plaintiff arrived at the appointment unaccompanied.[36]  Plaintiff rated the pain as a seven on a ten-point scale and described it as "[a]ching tight," constant, and exacerbated by movement.[37]

On examination, Dr. Mortley observed mild left lumbosacral paraspinal tenderness, no muscle spasm, limited spinal flexion, extension, and rotation but no observed or reported neurological signs and symptoms.[38]  Dr. Mortley reviewed and referenced a May 2015 lumbar spine imaging series that had been within normal limits.[39]  She recommended continuing the back brace and over-the-counter medication and consulted a specialist in physical medicine and rehabilitation.[40]  The specialist recommended "conservative

---

[33]     See id.

[34]     See Tr. 1168, 1171.

[35]     See Tr. 1171.

[36]     See id.

[37]     See id.

[38]     See Tr. 1169-70.

[39]     See Tr. 1170.

[40]     See id.

6

interventions including back school program in absence of any specific abnormalities in neuro or physical exam or x-rays."[41]

On October 14, 2016, Plaintiff returned to Dr. Mortley complaining of constant, dull pain that interfered with sleeping and getting comfortable and reporting that over-the-counter medications were not "really do[ing] anything" but the back brace helped "somewhat."[42]   On this date, the examination revealed moderate bilateral lumbosacral paraspinal tenderness, left muscle spasm, and limited spinal flexion, extension, and rotation but negative straight leg raising bilaterally.[43]  Dr. Mortley referred Plaintiff to back school as previously recommended on consult.[44]

Plaintiff failed to show for the back school program on December 12, 2016, and December 14, 2016, and was discharged from the program for noncompliance.[45]  On January 25, 2017, Plaintiff returned to Dr. Mortley complaining of low back pain.[46]  The nurse's initial evaluation for that visit noted no difficulty standing and no difficulty ambulating with the assistance of a cane, no one accompanying him, and no report of pain.[47]  Plaintiff told Dr.

_____

[41]     Tr. 1264.

[42]     Tr. 1266.

[43]     See Tr. 1267.

[44]     See Tr. 1267, 1277.

[45]     See Tr. 1301.

[46]     See Tr. 1296-1300.

[47]     See Tr. 1300.

Mortley that an injection and oral medication had alleviated the back pain.[48] On examination, Dr. Mortley observed lumbar paraspinal tenderness, greater on the left than the right, and mild lower lumbar vertebral tenderness.[49]   Dr. Mortley ordered another injection and refilled the prescription for oral medication.[50]

In early April 2017, Plaintiff returned for a back injection and, at that time, requested a referral to chiropractic care and a prescription for an anti-inflammatory, both of which Dr. Mortley fulfilled.[51]  From May 9, 2017, through July 16, 2017, Plaintiff underwent seventeen treatment sessions at Renner Chiropractic that included examinations, manipulations, and physical modalities.[52]

### 2.  PTSD and Depression

Just prior to the alleged onset date, on August 18, 2015, treatment notes from interpersonal therapy indicated that Plaintiff: (1) had "made excellent progress since beginning therapy as he ha[d] engaged effectively in both therapy and medication manag[e]ment[;]" (2) had showed "sig[ni]ficant improv[e]ment since beginning medication[;] and (3) had progressed in being able to

---

[48]     See Tr. 1297.

[49]     See Tr. 1298.

[50]     See Tr. 1299.

[51]     See Tr. 1314-15.

[52]     See Tr. 1318-29.

address previously avoided activities[.][53]  Plaintiff was assessed to be at low risk for self harm and was transferred out of individual therapy.[54]  At the time, Plaintiff confirmed that therapy had been helpful.[55]  Plaintiff's psychiatrist, Gregory Varhely, M.D., ("Dr. Varhely") continued medications to address Plaintiff psychiatric symptoms.[56]

On October 20, 2015, Plaintiff presented for psychiatric medication management and reported that his medication regimen was effective: "[T]his is the best group of meds that I've been on."[57] He denied medication side effects.[58]  Plaintiff described his mood as "ok" and reported decreases in fatigue, anhedonia, hypervigilence, startle reflex, emotional numbing, nightmares, sleep disturbances, and detachment, as well as increases in activities with family and friends.[59]  Plaintiff also stated that he had gone hunting.[60]  Dr. Varhely continued Plaintiff's medications.[61]  Plaintiff informed Dr. Varhely that he had stopped

---

[53]   Tr. 1005.

[54]   See Tr. 1003.

[55]   See Tr. 1002.

[56]   See Tr. 1007-08.

[57]   Tr. 1091.

[58]   See id.

[59]   See id.

[60]   See id.

[61]   See Tr. 1093.

9

individual therapy and was not interested in restarting or participating in other counseling options despite the doctor's expressed opinion that Plaintiff would benefit from continued individual therapy.[62]

On May 12, 2016, Plaintiff attended an appointment at which he reported his medications were "working well" and he was "doing well overall[.]"[63]   At that time, Plaintiff informed the treatment provider that he was attending college under veteran benefits and was planning to marry in two months.[64]   Plaintiff remained a low risk for self harm.[65]   Plaintiff declined participation in a weekly PTSD group.[66]

On May 31, 2016, Plaintiff appeared for a psychiatry consultation.[67]   Plaintiff denied side effects from his psychotropic medications and expressed an interest in continuing treatment with medication only.[68]   Although the psychiatrist, Alok Sarda ("Dr. Sarda"), noted that Plaintiff was motivated for treatment, Dr. Sarda also suggested that Plaintiff had not been compliant with medication prescriptions and recorded that Plaintiff declined

---

[62]   See Tr. 1091, 1093.

[63]   Tr. 1193-94.

[64]   See Tr. 1194.

[65]   See id.

[66]   See id.

[67]   See Tr. 1185-91.

[68]   See Tr. 1187.

participation in group therapy despite Dr. Sarda's encouragement to participate in all treatment modalities.[69]   A mental status examination produced the following results:

> Alert and cooperative male with adequate hygiene and grooming . . . Gait is normal . . . No abnormal movements were observed . . . Speech is normal in rate and rhythm . . . No thought disorders were observed . . . It is logical and goal directed with intact association . . . Able to smile and laugh appropriately . . . Memory appears intact . . . Appears oriented X 3 . . .[70]

While Dr. Sarda diagnosed Plaintiff with PTSD, the only problem identified was "[s]leep [d]ifficulties."[71]   On August 25, 2016, a treatment provider recorded a negative screen for depression.[72]

On September 23, 2016, Dr. Sarda saw Plaintiff and noted that Plaintiff reported no new side effects from psychotropic medications and stated that he was sleeping well through most nights with infrequent nightmares.[73]  Plaintiff raised the following concerns: "I am getting angry for no reason . . . I lock myself in a room . . . I slam doors . . . I am verbally aggressive . . . I am angry because of my finances[] . . . [my] sex drive is getting worst [sic] . . ."[74]  Plaintiff also stated that he was experiencing

---

[69]   See Tr. 1185, 1187, 1189-90.

[70]   Tr. 1188-89.

[71]   Tr. 1189.

[72]   See Tr. 1172.

[73]   See Tr. 1279.

[74]   Id.

a bad headache and could not attend the appointment for very long.[75] Dr. Sarda recorded a normal mental status examination with the same results as in May 2016.[76] Dr. Sarda again noted that he encouraged Plaintiff to take his medications as prescribed and that Plaintiff declined participation in any available treatment modality other than medication.[77]

On June 5, 2017, a nurse screened Plaintiff for PTSD and entered the disposition plan of no further intervention.[78]   Dr. Mortley acknowledged receipt of the plan.[79]

## B.   **Application to SSA**

On August 5, 2016, Plaintiff applied for disability insurance benefits claiming an inability to work since September 1, 2015, due to back injury, depression, anxiety, insomnia, PTSD, and migraine headaches.[80]

In September 2016, Plaintiff completed a function report in which he stated that he spent his days lying down while watching television.[81]   He reported that his wife administered his medication

---

[75]   See id.

[76]   See Tr. 1280.

[77]   See Tr. 1281-82.

[78]   See Tr. 1307.

[79]   See id.

[80]   See Tr. 57-58, 75, 180-81, 217, 239.

[81]   See Tr. 240.

12

and provided for the needs of the children and dogs.[82]  Plaintiff reported that he did not cook but dined with his wife.[83]  Citing back pain, Plaintiff stated the he did very little housework or yard work, limited to handwashing dishes or starting the dishwasher.[84]  He indicated that his back impairment affected his ability to lift, squat, bend, stand, walk, sit, climb stairs.[85]  He stated that he wore a prescribed back brace daily.[86]

Plaintiff reported that he no longer went to restaurants or the mall and, in fact, went outside rarely due to anxiety and he never went outside alone or drove.[87]  When he did leave his house, he said, he wore sunglasses to help with anxiety.[88]  However, he reported attending church weekly.[89]  Plaintiff described himself as "[q]uick tempered, distrustful[,] no sense of humor[,] just irritated[,] [n]o patience for people."[90]  He also stated that he was reclusive and could not deal with people or crowds and that he

---

[82]    See Tr. 240-41.

[83]    See Tr. 241.

[84]    See Tr. 241-42.

[85]    See Tr. 244.

[86]    See Tr. 245.

[87]    See Tr. 242, 244.

[88]    See Tr. 244.

[89]    See Tr. 243.

[90]    Tr. 244.

was terrified of loud noises.[91]  According to his report, his mental impairments affected his concentration and his ability to follow instructions and to get along with others.[92]  As medication side effects, Plaintiff listed insomnia, tiredness, drowsiness, dry mouth, light headedness, dizziness, and "weird heart rate/beating."[93]

On October 11, 2016, the SSA found Plaintiff not disabled at the initial level of review.[94]  The medical consultant reviewing Plaintiff's physical limitations did not address any physical impairment described in the regulations as presumptively disabling ("Listing")[95] but opined that Plaintiff was capable of occasionally lifting and/or carrying fifty pounds and frequently lifting and/or carrying twenty-five pounds.[96]  He further opined that, with normal breaks, Plaintiff could stand and/or walk or could sit for a total of six hours in an eight-hour workday.[97]  No other limitations were noted.[98]

The psychological consultant reviewing Plaintiff's mental

---

[91]    See Tr. 245.

[92]    See Tr. 244.

[93]    Tr. 246.

[94]    See Tr. 57-73, 92.

[95]    See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[96]    See Tr. 65.

[97]    See id.

[98]    See Tr. 65-66.

14

limitations found that Plaintiff did not meet Listing 12.04 for depressive, bipolar, and related disorders or Listing 12.06 for anxiety and obsessive-compulsive disorders.[99]   He opined that Plaintiff, despite limitations in understanding and memory, concentration and persistence, social interaction, and adaptation, was "able to understand, remember, and carry out detailed non-complex instructions, make decisions, maintain attention and concentration, interact with others, and respond to changes."[100]

A December 2016 disability report reflected that Plaintiff had recently returned to the doctor for back pain and had begun walking with a cane.[101]   In a function report completed about the same time, Plaintiff complained of constant back pain, weekly migraine headaches with sound and light sensitivity, anxiety when in crowds, drowsiness, and insomnia.[102]

Plaintiff stated that he spent his days watching television, taking naps, reading the Bible, and, on occasion, paying bills by telephone.[103]   Since the last report, Plaintiff said, his family had hired someone to help with the children, cooking, housework, and errands.[104]   Plaintiff indicated that he still did not cook but

---

[99]    See Tr. 64.

[100]    Tr. 70; see also Tr. 68-69.

[101]    See Tr. 250.

[102]    See Tr. 257.

[103]    See Tr. 258.

[104]    See id.

helped unload the dishwasher.[105]  Regarding activities affected by his back impairment, Plaintiff reported the same ones as in the September 2016 function report with the addition of kneeling.[106] Plaintiff indicated that he relied on the back brace and an non-prescribed cane on a daily basis.[107]

Plaintiff explained why he did not go outside alone: "I don't trust people.  I don't like the idea of people talking or even seeing me.  My home is my comfort zone."[108]  His church attendance was limited to once or twice a month, according to Plaintiff.[109]  He indicated that he did not get along well with authority figures, that he did not handle stress well, and that he did not like changes.[110]  According to this report, Plaintiff continued to have difficulty, due to his mental impairments, with concentration and the ability to get along with others but not with following instructions.[111]  Specifically concerning instructions, Plaintiff said he did "fine" with written instructions but "[n]ot well" with oral instructions.[112]  He also reported that his memory was affected

---

[105]    See Tr. 263.

[106]    See Tr. 261.

[107]    See Tr. 262.

[108]    Tr. 259.

[109]    See Tr. 260.

[110]    See Tr. 262.

[111]    See Tr. 261.

[112]    Id.

by his impairments, which he had not indicated in the prior report.[113] Plaintiff repeated the medication side effects listed in his first report and added headaches and depression.[114]

A friend who visited Plaintiff on a weekly basis also completed a function report in December 2016 and provided this answer to the question regarding how Plaintiff's impairments limit his ability to work: "He doesn't move aro[u]nd much. He has back pain and doesn't bend very well. He complains about sleep and nightmares. I don't think or can imagine him taking instructions from people."[115] The friend reported that Plaintiff stayed in the living room "all day and night" not doing much other than drawing and watching videos and that the hired assistant prepared Plaintiff's lunches and performed housework.[116] According to the friend, Plaintiff did not shave, did not bathe regularly, and needed assistance with hygiene and medications.[117]

The friend shared that Plaintiff never went outside except to doctor appointments with an escort, that he avoided people, that he never felt safe, and that "he always seem[ed] irritable and combative."[118] Plaintiff did not handle stress or changes in

---

[113] See id.

[114] See Tr. 264.

[115] Tr. 265.

[116] Tr. 266.

[117] See Tr. 266-67.

[118] See Tr. 268, 270.

17

routine very well, the friend reported.[119]  He also reported that Plaintiff "ha[d] security monitors that he constantly check[ed] on his smart phone[, was] [a]lways requesting someone to check the [twenty-three] locks [on the doors of his house, and] inquire[d] about noises from outside because he seem[ed] super paranoid."[120]

On January 20, 2017, Plaintiff underwent a consultative clinical interview by Bradley Powell, Ph.D., ("Dr. Powell").[121] Plaintiff drove himself to the appointment and arrived on time.[122] Dr. Powell noted that Plaintiff was wearing a back brace and dark sunglasses that he did not remove throughout the interview and "walked unsteadily with the cane."[123]  Dr. Powell recorded Plaintiff's chief complaint as PTSD and opined that he appeared "very anxious and unsettled."[124]  Plaintiff provided information regarding the precipitating events underlying the PTSD diagnosis and a history of medication and treatment.[125]

Plaintiff reported that, at the time of the interview, he took his medications "off and on" but "never felt that they were of

---

[119]    See Tr. 271.

[120]    Id.

[121]    See Tr. 1285-87.

[122]    See Tr. 1285.

[123]    Id.

[124]    Id.

[125]    See Tr. 1285-86.

18

great help."[126]  As symptoms, Plaintiff stated that he "struggle[d] with recurrent intrusive recollections of the dramatic [sic] events surrounding the numerous times when he and his unit were involved in explosions causing much damage and carnage."[127]  Plaintiff reported that he experienced "recurring distressing dreams," that he became violent at times, that he had attacked his wife during these episodes, that he experienced flashbacks when riding in cars or hearing sounds reminiscent of past events.[128]  Overall, Plaintiff said, "[H]e just [felt] stressed and pretty miserable most of the time."[129]

Plaintiff's account of his activities of daily living ("ADLs") led Dr. Powell to the conclusion that Plaintiff was "able to perform most basic" ADLs.[130]  Plaintiff said that he was uncomfortable in public and did not like to be outside.[131]  Dr. Powell opined that Plaintiff's sad mood and his anxiety negatively impacted his social functioning.[132]  Plaintiff shared that, although he tried to help with the children, he really just worked to get

---

[126]    Tr. 1286.

[127]    Id.

[128]    Id.

[129]    Id.

[130]    Id.

[131]    See id.

[132]    See Tr. 1286-87.

19

through each day.[133]  Based on these self-reports, Dr. Powell found
it "very unlikely that [Plaintiff] would be able to function
successfully in a work setting."[134]

Dr. Powell performed a mental status examination with
primarily normal results with a few aberrant findings: (1)
Plaintiff made poor eye contact; (2) Plaintiff's behavior was
"somewhat bizarre" in that he was "constantly looking around" and
asked several times which door led out; (3) Plaintiff demonstrated
increased psychomotor activity; (4) Plaintiff's mood appeared
depressed and anxious with paranoia, and his affect was "increased
in intensity[;]" and (5) Plaintiff's "thinking [was] tangential as
he tend[ed] to ramble a bit but d[id] eventually get back to the
topic."[135]

Dr. Powell affirmed Plaintiff's diagnosis of PTSD but did not
find him to carry a diagnosis of depression.[136]  Dr. Powell opined
that Plaintiff's prognosis was "very guarded due to the severity
and chronic nature of his mental health problems and his limited
response to treatment."[137]  Dr. Powell also opined that Plaintiff
understood the meaning of filing for benefits and was able to

---

[133]    See Tr. 1287.

[134]    Id.

[135]    Id.

[136]    See id.

[137]    Id.

manage benefit payments himself.[138]

On February 14, 2017, the SSA again found Plaintiff not disabled on reconsideration.[139]  The reviewing medical consultant agreed with the prior assessment as to Plaintiff's physical limitations.[140]  The reviewing psychological consultant found that Plaintiff did not meet Listing 12.15 for trauma- and stressor-related disorders.[141]  His opinion differed from the prior psychological consultant's review in that he found no limitations in understanding and memory or adaptation, but he agreed with the residual functional capacity ("RFC") articulated in the initial review.[142]

On March 1, 2017, Plaintiff requested a hearing before an ALJ.[143]  A disability report dated March 6, 2017, which was completed by Plaintiff's attorney, indicated that Plaintiff was taking no prescription or non-prescription medications.[144]  On April 27, 2017, the ALJ granted Plaintiff's request and scheduled the hearing by video conference on August 17, 2017.[145]

---

[138]   See Tr. 1284.

[139]   See Tr. 74-89, 98.

[140]   See Tr. 83-84.

[141]   See 79-80.

[142]   See Tr. 85-86.

[143]   See Tr. 99-100.

[144]   See Tr. 275-76, 278.

[145]   See Tr. 116.

C.  **Hearing**

During the hearing, Plaintiff and a vocational expert testified.[146]  Plaintiff was represented by an attorney.[147]  The ALJ began the hearing by examining Plaintiff about personal information and work history.[148]  Plaintiff confirmed that he was receiving benefits from the VA.[149]

In response to the questioning, Plaintiff explained that he could not work due to back pain, which caused "issues with range of motion, bending, and twisting[,]" and PTSD, anxiety, and depression, which he said he was "uncomfortable" discussing.[150] Plaintiff's first complaint about how his impairments affected his ability to work was that he was "constantly going in and out of appointments with the chiropractor or the VA" and "it [took] a lot of time out of [his] day."[151] He said that he had driven himself to these appointments but typically his mother or father-in-law took him.[152]

First addressing the back impairment in greater detail, Plaintiff reported that the VA prescribed a muscle relaxer for back

---

[146]   See Tr. 32-56.

[147]   See Tr. 32.

[148]   See Tr. 36-41.

[149]   See Tr. 36.

[150]   Tr. 41.

[151]   Id.

[152]   See Tr. 51.

pain and that he had also received three back injections.[153] Plaintiff reported that the first injection alleviated the pain for about two days and the second and third did nothing.[154]   Upon referral, Plaintiff said, he began treatment with a chiropractor.[155] Addressing the course of chiropractic treatment beginning in May 2017, Plaintiff claimed that the "only thing" the chiropractor had done was to give Plaintiff a back brace but then further described the treatment as also including "electro therapy three times a week," the use of a back stretching machine, and chiropractic adjustments.[156]  Pursuant to this treatment, Plaintiff admitted, his back pain had been reduced from a seven or eight to a four or five on a ten-point scale and had remained "mostly in the lower range" but that he still experienced "some days where [he] struggle[d] with moving around."[157]  He reported that the frequency of bad days was inconsistent.[158]  Plaintiff also mentioned the use of the non-prescription cane.[159]

Regarding his psychiatric issues, Plaintiff identified the source of PTSD as being "blown up three different times" while

---

[153]   <u>See</u> 42-43.

[154]   <u>See</u> Tr. 44.

[155]   <u>See</u> Tr. 44.

[156]   Tr. 42; <u>see also</u> Tr. 41, 43.

[157]   Tr. 44, 49.

[158]   <u>See</u> Tr. 49.

[159]   <u>See</u> Tr. 43.

serving in the military.[160]  He said the last time, in May 2011, was when he was injured and hospitalized and when his mental state deteriorated.[161]  When asked about the symptoms of PTSD, Plaintiff responded:

> Sudden loud noises will do that, and the sounds of helicopters.  And the reason why I say that is because whenever we were blown up, I was flown out on a helicopter, so I don't like that.  I don't deal with that very well.  And I definitely don't do loud, unexpected noises.  I don't like people coming up behind me and unexpectedly tap[ping] me on the shoulder, or -- I don't like sitting.  I have to have the wall to my back if I'm sitting somewhere.[162]

Due to anxiety and PTSD, Plaintiff testified, he would "come off as very aggressive" and had "gotten into several confrontations, and whatnot, in the last few years[] that could have easily got[ten] [him] thrown in jail."[163]  Therefore, he said, he did not like to "go[] into town."  He described his mood swings as quickly shifting from "laughing and joking" to "yelling and screaming."[164]  He described himself as irritable and impatient with "unexpected" changes in behavior.[165]  Regarding these episodes, Plaintiff said that, because he did not go out in public more than once or twice a week to go to church, appointments, and/or his

---

[160]    Tr. 50; see also Tr. 49.

[161]    See Tr. 50.

[162]    Id.

[163]    Tr. 45; see also Tr. 50.

[164]    Tr. 45-46.

[165]    Tr. 46.

mother's house, he had only experienced two episodes in public over the prior month, but that he experienced getting upset over a trivial matter once a day while at home.[166]  Plaintiff attested to the interference of these episodes with his ability to interact with other people.[167]

When asked whether he had been hospitalized for psychiatric treatment since March 2013, Plaintiff stated that he had not.[168]  On a similar question regarding counseling since he stopped individual therapy in October 2015, Plaintiff stated that "As far as sitting down with counselors, I don't -- I just don't do that anymore."[169] He explained that he did not want to participate in counseling because he did not "like sitting there, repeating the same things over and over."[170]  He further asserted that counseling did not do anything for him: "I've already got to a point where I'm just - - I'm past that.  I don't want to talk about it anymore."[171]

On medication efficacy, Plaintiff said that Abilify (generically, aripiprazole), which is used to treat mood disorders among other psychiatric issues, improved his mood but that he did

---

[166]   See Tr. 49, 51.

[167]   See Tr. 50.

[168]   See Tr. 44.

[169]   Tr. 47.

[170]   Id.

[171]   Id.

not like how it "made [him] feel in [his] sleep."[172]  He said that,
after he separated from the U.S. Army, the VA told him Abilify was
no long available.[173]  According to Plaintiff, the replacement drugs
caused drowsiness or shakiness and interfered with getting
consistent sleep and made him feel "zombie-like, where [he was]
just kind of in a zone where [he was] not paying attention."[174]
Plaintiff admitted that he was "not really" taking the medication
since December 2016 but, rather, was "self-medicating," and only
taking medication when his wife was watching.[175]

The ALJ turned to the vocational expert, who classified
Plaintiff's prior job as a boatswain mate as heavy and skilled, his
job as a stock clerk as heavy and unskilled, his job as a security
guard as light and semi-skilled, his job as a dispatcher as
sedentary and skilled, his job as a truck driver in the military as
medium and semi-skilled, and his job as an alarm installer as
sedentary and skilled based on how he performed it.[176]

The ALJ then posed a hypothetical individual capable of
lifting, carrying, pushing, and pulling fifty pounds occasionally,
twenty-five pounds frequently; standing, walking, or sitting six

---

[172]    Tr. 45.

[173]    See id.

[174]    See id.

[175]    Tr. 47.

[176]    See Tr. 52-53.

26

hours in an eight-hour day; frequently reaching overhead
bilaterally, frequently stooping, kneeling, crouching, and
crawling; frequently climbing ramps and stairs; occasionally
climbing ladders, ropes, or scaffolds; understanding, remembering,
and carrying out tasks requiring no more than one-, two-, three-
step instructions, free of any fast-paced production requirements
and involving only simple work-related decisions; occasionally
making decisions; and occasionally interacting with supervisors,
co-workers, and the public.[177]  The vocational expert responded that
such an individual could not perform any of Plaintiff's past
relevant work but that such an individual could perform the work of
a hospital cleaner, a price marker, and an office cleaner, each of
which sufficient jobs existed in the state and national
economies.[178]  The ALJ reduced the amount of interaction with others
to incidental, and the vocational expert confirmed that the
hypothetical individual still would be able to perform the three
cited jobs.[179]  When the ALJ also added that the hypothetical
individual would be off task twenty percent of the time due to
concentration problems and would be absent two to three days per
months due to chronic symptoms, the vocational expert found that
the hypothetical individual could perform the jobs but could not

---

[177]     Tr. 53.

[178]     See Tr. 53-54.

[179]     See Tr. 54.

maintain employment.[180]

## D.  __Commissioner's Decision__

On October 3, 2017, the ALJ issued an unfavorable decision.[181]
The ALJ found that Plaintiff had not engaged in substantial gainful
activity since September 1, 2015, the alleged onset date.[182]   The
ALJ recognized the following impairments as severe: lumbago, PTSD,
and depression.[183]   However, the ALJ found an ankle disorder, a
flat-foot condition, and "other symptoms and complaints that
appear[ed] periodically throughout the record" to be nonsevere,
explaining that those impairments "ha[d] caused only transient
and/or mild symptoms and limitations, [we]re well controlled with
treatment, ha[d] not lasted or [we]re not expected to last for
twelve months, [we]re historical diagnoses that ha[d] since been
resolved, or [we]re otherwise not adequately supported by the
medical evidence in the record."[184]   The ALJ noted, though, that all
of Plaintiff's severe and non-severe impairments informed her
determination of Plaintiff's RFC.[185]

At the Listing step, the ALJ found that Plaintiff did not meet

---

[180]     See Tr. 54-55.

[181]     See Tr. 10-27.

[182]     See Tr. 12.

[183]     See Tr. 12-13.

[184]     See Tr. 13.

[185]     See id.

the requirements of any Listing, specifically addressing physical and mental Listings.[186]  None of the Listings in the category for neurological disorders were met with regard to Plaintiff's headaches because, as found by the ALJ, the record did not reveal certain requisites such as seizures, motor or sensory deficits, or a marked limitation in any area of mental functioning.[187]  The ALJ also found that Listing 1.04 for disorders of the spine was not met because the record indicated that, although Plaintiff used a cane to walk, his condition did not require that both upper extremities be involved in assisting ambulation.[188]

Turning to the mental health Listings, the ALJ devoted about four pages to her discussion of three mental disorders:  Listing 12.04 for depressive, bipolar, and related disorders; Listing 12.06 for anxiety and obsessive-compulsive disorders; and Listing 12.15 for trauma- and stressor-related disorders.[189]  In her discussion of these mental health Listings, the ALJ thoroughly addressed the various broad areas of functioning and rated Plaintiff's limitations in each.[190]  The discussion of each area proceeded through Plaintiff's relevant subjective complaints (including

---

[186]    See Tr. 13-17.

[187]    See Tr. 13-14.

[188]    See id.

[189]    See Tr. 13-17.

[190]    See Tr. 14-17.

medication side effects), the objective medical evidence, and the consultative psychological examination.  The ALJ concluded that Plaintiff experienced:  (1) a mild limitation in understanding, remembering, or applying information; (2) a moderate limitation in interacting with others; (3) a moderate limitation in concentrating, persisting, or maintaining pace; and (4) a moderate limitation in adapting or managing oneself.[191]

As the severity of each area of functioning caused no more than moderate limitation, the ALJ found that the paragraph B criteria of the Listings were not met.[192]  Considering paragraph C criteria, the ALJ stated, "The record does not establish that the claimant has only marginal adjustment, that is, minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life."[193]  In support of this statement, the ALJ cited examples from the record.[194]  Thus, the ALJ found that Plaintiff did not meet or equal any Listing for mental disorders and noted that this finding was consistent with the psychological consultants' opinions on prior review of the record.[195]  In conclusion, the ALJ acknowledged that the paragraph

---

[191]     See id.

[192]     See Tr. 17.

[193]     Tr. id.

[194]     See id.

[195]     See Tr. 14, 17.

B criteria were used to rate severity of his mental impairments not
to assess RFC and that the latter "require[d] a more detailed
assessment."[196]

> The ALJ found Plaintiff's RFC allowed him:

> to lift and carry[] 50 pounds occasionally and 25 pounds
> frequently; stand, walk, and sit for 6 hours each in an
> 8-hour day; frequently reach overhead in any direction
> bilaterally; frequently stoop, kneel, crouch, and crawl;
> frequently climb ramps/stairs; and occasionally climb
> ladders, ropes, and scaffolds. The claimant can
> understand, remember and carry out tasks requiring no
> more than 1-2-3 step instructions, free of any fast-paced
> production requirements, involving only simple work-
> related decisions and, occasional decision making,
> changes in the work setting and interaction (contact is
> incidental to work performed) with supervisors,
> coworkers, and the public.[197]

> The ALJ discussed the Plaintiff's function reports and hearing
testimony, including subjective symptoms of both his back
impairment and his mental health impairments.[198]  She noted that
Plaintiff admitted that sessions with the chiropractor had helped
with his back pain but, nevertheless, he used a non-prescribed cane
to help relieve pressure on his back.[199]  Regarding mental health,
the ALJ acknowledged pre-onset treatment, including inpatient
treatment in 2013, medication until December 2016 when Plaintiff
discontinued it because of negative side effects, and counseling

---

[196]   Tr. 17.

[197]   Id.

[198]   See Tr. 18, 22-23.

[199]   See Tr. 18.

which he also stopped because he felt it did not help him.[200]

The ALJ also discussed Plaintiff's ADLs, self-reported limitations, and medication side effects.[201]   Finding that Plaintiff's medically determinable impairments could be expected to cause his symptoms but that the medical record did not support the intensity, persistence, and limiting effects that Plaintiff represented, the ALJ accordingly limited the weight given those subjective allegations.[202]

The ALJ discussed the objective medical evidence regarding treatment for Plaintiff's headaches, traumatic brain injury, and back impairment, concluding that medical records from a few months prior to the onset date through 2017 "revealed generally normal, with only minimal, objective findings."[203]   The ALJ cited specific examination results during that period to illustrate her point and noted that "the course of treatment consistently was conservative, including medication, injections, and a recommendation to wear a back brace."[204]   The ALJ concluded that the evidence, "including diagnostic imaging, objective findings, a conservative course of treatment, and [Plaintiff's] actions and admissions," fully

---

[200]    See id.

[201]    See Tr. 19, 22-23.

[202]    See Tr. 19.

[203]    Tr. 19; see also Tr. 20.

[204]    Tr. 20; see also Tr. 19.

supported the ALJ's physical RFC determination.[205]

Turning to the medical records concerning Plaintiff's mental health, the ALJ reached the same conclusion that "the record reveal[ed] generally normal, with only minimal, objective findings."[206]  The ALJ listed examples of normal results throughout Plaintiff's medical record.[207]  The ALJ also pointed out that Plaintiff had not received inpatient treatment since the alleged onset date and that "the record merely documented a conservative course of mental treatment . . ., consisting of medication and talk therapy, both of which [Plaintiff] chose to stop."[208]  Moreover, the ALJ stated, those records contradicted Plaintiff's denials of benefit from medication and therapy and his complaints of medication side effects.[209]  The ALJ also discussed Dr. Powell's consultative examination results, finding that, despite a few abnormal findings, "otherwise revealed a broad range of normal findings."[210]  Regarding Dr. Powell's opinion, the ALJ stated that Dr. Powell "simply opined that [Plaintiff] was able to manage benefit payments in his own interest and could understand the meaning of filing benefits [but] failed to set forth an opinion

---

[205]    Tr. 20.

[206]    Id.

[207]    See Tr. 21.

[208]    Id.

[209]    See id.

[210]    See Tr. 21-22.

with specific functional limitations."[211]   The ALJ found that the medical evidence "fully support[ed] the mental limitations in the assessed [RFC]."[212]

The ALJ explained the reasons for the following assessments of weight to the medical evidence: (1) limited weight to the VA disability ratings; (2) limited weight to the function report completed by Plaintiff's friend; (3) great weight to the opinions of the medical consultants who reviewed Plaintiff's record at the first two levels of consideration; (4) some weight to the opinions of the psychological consultants who reviewed the record at the first two levels of consideration; (5) some weight to Dr. Powell's opinions; and (6) limited weight to the Global Assessment of Function[213] scores in the record.[214]

The ALJ found Plaintiff unable to perform his past relevant work but, relying on the vocational expert's testimony, found Plaintiff able to perform jobs that existed in significant numbers in the national economy.[215]   The ALJ specifically identified

---

[211]     Tr. 24.

[212]     Tr. 22.

[213]     The global assessment of function score is a way to for a mental health provider to subjectively estimate an individual's social, occupational, and psychological functioning.  See Diagnostic & Statistical Manual of Mental Disorders 34 (Am. Psychiatric Ass'n 4th ed. 2000)(replaced in 2013 by the fifth edition, which dropped GAF in favor of the World Health Organization Disability Assessment Schedule 2.0).

[214]     See Tr. 23-24.

[215]     See Tr. 25-26.

hospital cleaner, price marker, and office cleaner as jobs within Plaintiff's RFC.[216]   Therefore, the ALJ found that Plaintiff was not disabled at any time from September 1, 2015, the alleged onset date, through October 3, 2017, the date of the ALJ's decision.[217]

A week after the issuance of the ALJ's decision, Plaintiff submitted a handwritten letter inquiring about the denial.[218]   In that correspondence, Plaintiff reported experiencing intrusive thoughts and did not trust himself, explaining that he was experiencing "[u]nwanted thoughts of hurting or killing strangers and not ever knowing why[.]"[219]

On October 18, 2017, Plaintiff appealed the ALJ's decision.[220] On January 17, 2018, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[221]   After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[222]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner

---

[216]   See Tr. 26.

[217]   See Tr. 10, 27.

[218]   See Tr. 298.

[219]   Id.

[220]   See Tr. 179.

[221]   See Tr. 1-5.

[222]   See Tr. 1-3; Doc. 1, Pl.'s Compl.

denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5ᵗʰ Cir. 2002).

## A.   Legal Standard

In order to obtain disability benefits, an individual bears the ultimate burden of proving he is disabled within the meaning of the Act.   Wren v. Sullivan, 925 F.2d 123, 125 (5ᵗʰ Cir. 1991). Under the applicable legal standard, an individual is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5ᵗʰ Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); Jones v. Heckler, 702 F.2d 616, 620 (5ᵗʰ Cir. 1983).

To determine whether an individual is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe

impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B.  Substantial Evidence

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, ____ U.S. ____, 139 S. Ct. 1148, 1154 (2019) (internal quotations marks omitted) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Id.  It only requires "more than a mere scintilla." Id. (quoting Consol. Edison Co., 305 U.S. at 229).

The Commissioner has the responsibility of deciding any conflict in the evidence. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42

U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability insurance benefits.  Plaintiff asserts that the ALJ's decision contains one error: The RFC determination was not supported by substantial evidence.  Within his discussion of this issue, Plaintiff asserts that "[t]he ALJ's decision contains numerous errors, internal inconsistencies, and misrepresentations of the evidence."[223]  As the court can best discern, two sub-issues, more legal in nature, dominate Plaintiff's challenge to the RFC assessment: (1) the ALJ did not comply with discussion requirements regarding the RFC determination; and (2) the ALJ failed to properly address Dr. Powell's examination.

---

[223]   Doc. 18, Pl.'s Mot. for Summ. J. p. 7.

The court begins by stating the relevant legal standards and applying them to the two legal challenges.  Thereafter, the court examines whether substantial evidence supports the ALJ's RFC determination.

## A.   <u>Relevant Legal Standards</u>

An individual's RFC is his remaining ability to work despite all of the limitations resulting from his impairment.  <u>See</u> 20 C.F.R. § 404.1545(a); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1023 (5th Cir. 1990).  In evaluating the RFC, the ALJ is directed by the regulations to consider how the individual's impairments affect his physical, mental, and other abilities, as well as the total limiting effects of his impairment.  <u>See</u> 20 C.F.R. § 404.1545(b)-(e).

The ALJ is required to perform and discuss a function-by-function assessment of "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." <u>Myers v. Apfel</u>, 238 F.3d 617, 620 (5th Cir. 2001)(quoting SSR 96-8p, 1996 WL 374184, at *1).  The ALJ must "describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record[,]" and "explain how any material inconsistencies or ambiguities in the evidence . . . were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7.  Additionally, the ALJ must engage in a discussion "describing how the evidence supports each

conclusion, citing specific medical facts . . . and nonmedical evidence[.]" <u>Id.</u>

However, the mere mention of a condition in the medical record does not establish a disabling impairment or even a significant impact on that individual's functional capacity. <u>Cf.</u> <u>Johnson v. Sullivan</u>, 894 F.2d 683, 685 (5th Cir. 1990) (referring to a diagnosis as only part of the evidence that must be considered). The individual must show that he is "so functionally impaired" by the condition that he is precluded from engaging in any substantial gainful activity. <u>Hames v. Heckler</u>, 707 F.2d 162, 165 (5th Cir. 1983).

SSR 16-3p explains that "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." SSR 16-3p, 2016 WL 1119029, at *2. Even so, an ALJ cannot ignore statements of symptoms but, rather, must evaluate them according to the two-step process set forth in the regulations: (1) consideration of "whether there is an underlying medically determinable physical or mental impairment[] that could reasonably be expected to produce an individual's symptoms, such as pain;" and (2) evaluation of "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." <u>Id.</u> The SSR lists nonexclusive factors to consider in the evaluation: (1) ADLs; (2) location, duration,

frequency, and intensity of symptoms; (3) factors that precipitate and aggravate symptoms; (4) medication dosage, effectiveness, and side effects; (5) treatment; and (6) measures that alleviate symptoms.  See id. at *7.

In addition to the individual's subjective complaints, the ALJ must evaluate every medical opinion together with all relevant evidence and, in deciding what weight to give each, must consider the examining relationship, the treatment relationship, supportability, consistency, specialization, and any other factor that tends to support or contradict the medical opinion.  See 20 C.F.R. § 404.1527(b), (c).

The court must give deference to the ALJ's evaluation of the plaintiff's subjective complaints if supported by substantial record evidence.  See Villa, 895 F.2d at 1024.  The ultimate responsibility for determining the individual's RFC lies with the ALJ.  20 C.F.R. § 404.1527(d)(2); Taylor v. Astrue, 706 F.3d 600, 602-03 (5th Cir. 2012).  "[P]rocedural perfection" is not required as long as the individual's substantial rights are not affected. Taylor, 706 F.3d at 603.

### 1.  Discussion Requirements

Plaintiff argues that the ALJ failed to meet discussion requirements on the consistency of Plaintiff's symptoms with the record evidence and on the responsiveness of the specific limitations in the RFC to Plaintiff's impairments.  The court

41

disagrees entirely with Plaintiff regarding the sufficiency of the ALJ's discussion.

The ALJ's decision included seven pages of discussion on Plaintiff's RFC.  On top of that, the ALJ devoted four more pages to a function-by-function assessment of mental impairments at step three of the analysis.  On those pages, the ALJ specifically articulated Plaintiff's subjective testimony on physical and mental limitations derived from Plaintiff's function reports and hearing testimony.  The ALJ set out SSR 16-3p's two-step process for evaluating symptoms and employed it to conclude that Plaintiff did have underlying medical conditions that could cause Plaintiff's symptoms but not to the degree of limitation alleged.[224]

In her discussion of the mental Listings, the ALJ rated Plaintiff's limitations in each area of mental functionality with supportive discussion of each.  In her RFC discussion, the ALJ contrasted, impairment by impairment, Plaintiff's descriptions of pain and functional limitations with other medical evidence.  Specifically, the ALJ contrasted those subjective complaints against sporadic noncompliance with medication and other treatment modalities, self-reports to treatment providers of no pain and of medication effectiveness, ADLs, and testing results and

---

[224]   Plaintiff takes issue with the ALJ's "broad finding" that Plaintiff's subjective complaints were not entirely consistent with the medical record.  Doc. 18, Pl.'s Mot. for Summ. J. p. 9.  That "broad finding" did not stand alone but, rather, summarized the ALJ's discussion and resulting conclusion.  As Defendant points out, the ALJ stated as much in the remainder of the sentence ignored by Plaintiff, which was "for the reasons explained in this decision."  Tr. 19.

observations that fell within normal ranges.  The ALJ specifically
stated  that  Plaintiff's  alleged  level  of  incapacity  was
inconsistent  with  the  cited  evidence  and  resolved  the
inconsistencies in favor of the objective medical records.

The  decision  clearly  articulated  the  weight  given  to
Plaintiff's alleged symptoms and cited record evidence supporting
the ALJ's RFC.  It further evinced the ALJ's consideration of the
factors  mentioned  in  SSR  16-3p  as  relevant  to  evaluating  the
intensity, persistence, and limiting effects of his symptoms.  The
ALJ also discussed how the symptoms affected Plaintiff's physical
and mental abilities and described the maximum amount of work-
related activities he could perform.

As the "most obvious example" of the ALJ's alleged failure to
include  limitations  that  were  responsive  to  Plaintiff's
impairments,  Plaintiff  pointed  to  headaches,  arguing  that  no
limitation in the RFC addressed that impairment.[225]  In fact, the
ALJ specifically stated in her decision that the she accounted for
headaches in the RFC assessment, and nothing moves the court not to
believe that statement.  Although not specifically identified as
responsive  to  headaches,  the  climbing  restrictions  and  mental
limitations included in the RFC do address potential interference
with work activities caused by headaches.

More  importantly  though,  the  record  is  devoid  of  evidence

---

[225]    Doc. 18, Pl.'s Mot. for Summ. J. p. 9.

during the alleged disability period, other than the diagnosis itself, that suggests Plaintiff was limited by his headaches. Plaintiff did not mention any limitation from headaches in his first function report.  In his second function report, he stated that he experienced weekly headaches, but nothing in the medical evidence supports that frequency.  Plaintiff rarely complained of headaches at doctor appointments and reported that the medication was usually successful in aborting headache onset.  Plaintiff did not mention headaches or any limitations from headaches during the hearing.  Despite the diagnosis, the record does not reflect they rendered him incapable of engaging in any substantial gainful activity during the relevant period.[226]

Because the ALJ followed the requirements of the regulations and SSRs, the ALJ committed no legal error.

## 2.  Dr. Powell's Examination

Plaintiff argues that the ALJ failed to properly address Dr. Powell's consultative evaluation.  Plaintiff takes issue with the ALJ's assignment of "some weight" to Dr. Powell's opinions because it is a "meaningless phrase and provides no insight whatsoever as to how or if Dr. Powell's opinion and observations were accounted for in the RFC."[227]  Again, the court completely disagrees.

---

[226]   As evidence of the limitations caused by headaches, Plaintiff cites frequently leaving work early due to headaches in 2013, two years prior to the alleged onset date and prior to successful control by medication.

[227]   Doc. 18, Pl.'s Mot. for Summ. J. p. 11; Tr. 24.

"Some weight" means partial weight.  As Plaintiff notes, the ALJ referenced aspects of Dr. Powell's evaluation that the ALJ found to support her conclusions at different stages of the disability analysis.  Those were the parts that the ALJ accorded weight.  The ALJ stated that Dr. Powell "simply opined that the claimant was able to manage benefit payments in his own interest and could understand the meaning of filing for benefits" but "failed to set forth an opinion with specific functional limitations."[228]  Because Dr. Powell failed to explain functional limitations, that was the part that the ALJ found diminished the weight to which his opinions were entitled.  Dr. Powell's evaluation was not entitled to any special weight as he was a one-time examiner whose opinions were not fully consistent with the medical record.

Plaintiff disagrees with the ALJ's assessment that Dr. Powell's report was "generally normal" and with the ALJ's conclusion that it supported her determination.[229]  Frankly, Plaintiff's disagreement with the ALJ is irrelevant.  The ALJ is tasked with weighing and evaluating the evidence.  Plaintiff's differing opinion cannot replace the ALJ's judgment.  The court is not even entitled to do that.

---

[228]     Tr. 24.  The court does not read the ALJ's statement to mean that the only opinion offered by Dr. Powell was about Plaintiff's abilities to manage payments and understand the meaning of filing but that it was the only portion of the opinion that addressed functional abilities.

[229]     See id. p. 12; Tr. 21.

Plaintiff argues that the ALJ failed to consider Dr. Powell's opinion that it was "very unlikely that [Plaintiff] would be able to function successfully in a work setting."[230]  Although the ALJ did not mention that particular statement, her decision reflected that she certainly did consider Dr. Powell's report in full. Furthermore, the ALJ was warranted in disregarding that opinion as it offered a determination reserved to the ALJ.  See 20 C.F.R. § 404.1527(d)(1)(stating that a medical source's statement that the individual is "disabled" or "unable to work" does not mean the Commissioner will determine the individual is, in fact, disabled); Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003)(stating that [a] medical source's "determination[] that an applicant is 'disabled' or 'unable to work'" ha[s] no special significance).

Plaintiff contends that the ALJ also ignored Dr. Powell's finding that Plaintiff's prognosis was "very guarded."[231]  The court also finds no error in the failure to mention that statement. Plaintiff stopped short of Dr. Powell's reasoning for that prognosis, which was "due to the severity and chronic nature of his mental health problems and his limited response to treatment."[232] The ALJ is not required to discuss every piece of evidence.  See Giles v. Astrue, 433 F. App'x 241, 251 (5th Cir.

---

[230]    Tr. 1287.

[231]    Doc. 18, Pl.'s Mot. for Summ. J. p. 11; Tr. 1287.

[232]    Tr. 1287.

2011)(unpublished)("[T]here will always be some evidence that is not specifically discussed the Commissioner's decision.  Our review is limited to examining whether the decision to deny benefits is supported by substantial evidence in the record[.]").  Additionally, the source of information forming the basis of the opined prognosis appears to be Plaintiff, and the finding that Plaintiff experienced limited response to treatment is contradicted by evidence in the medical record that showed, inter alia, his medication controlled all of his impairments and that he was successfully discharged from individual psychotherapy just prior to the alleged onset date.

As something of an aside, Plaintiff complains that the ALJ failed to recognize that Plaintiff "need not be wholly incapable of performing any activity at all in order to be found disabled."[233] That statement generally rings true; however, the ultimate burden was on Plaintiff to prove he was disabled.  The threshold for the sufficiency of evidentiary support for the ALJ's determination is rather low, to wit, merely a scintilla.

The ALJ's discussion of Dr. Powell's evaluation complies with the requirements of the regulations, SSRs, and case law to evaluate every medical opinion in the record and decide what weight to give each.

B.  **Substantial Evidence**

---

[233]    Doc. 18, Pl.'s Mot. for Summ. J. p. 12

Because the ALJ committed no legal error, if the ALJ's determinations regarding the intensity and persistence of symptoms and the extent to which they limited Plaintiff were supported by substantial evidence, they are entitled to deference.  Far more than a mere scintilla of evidence supports the ALJ's RFC determination and ultimate determination of not disabled.

During the alleged disability period, Plaintiff attended the majority of his appointments on his own, rarely complained of headaches at appointments, infrequently complained of back pain at appointments, reported to treatment providers that his symptoms were alleviated by medication and other conservative treatment, denied medication side effects to treatment providers, indicated that chiropractic care and individual psycho-therapy had been helpful, admitted to inconsistent compliance with medication, failed to attend back school as prescribed, and repeatedly declined treatment modalities recommended by his medical providers, including physical therapy and psycho-therapy.

In contrast to a functional report dated September 2016, in which Plaintiff reported that he spent his days lying down while watching television, within the prior year of alleged disability, Plaintiff had a much more active lifestyle.  In October 2015, he went hunting, and, in May 2016, he was attending college and planning his July 2016 wedding.

The only suggestion of severe functional limitations was in

Plaintiff's own testimony.  Even there, though, the evidence only demonstrated that Plaintiff did not engage in many chores and other activities, not that he was as limited as he portrayed.  As is often the case, Plaintiff's reports to the SSA reflected greater and greater limitation throughout the application process, even though the medical records did not.

The ALJ engaged in a proper evaluation of Plaintiff's RFC, and substantial evidence in the record supports her conclusion.  The evidence cited above exceeds the necessary quantum of evidence to support the ALJ's RFC determination and the finding that Plaintiff was not disabled.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's cross-motion be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers

of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

 **SIGNED** in Houston, Texas, this 21st day of August, 2019.

<br>

_____
Nancy K. Johnson
United States Magistrate Judge